*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ELIZABETH O'BRIEN, Individually and as Personal Representative of the ESTATE OF BERNARD FRANCIS O'BRIEN III

UNPUBLISHED
April 16, 2026
11:17 AM

Plaintiff-Appellant,

v

TRINITY HEALTH-MICHIGAN, doing business as TRINITY HEALTH ANN ARBOR HOSPITAL,

No. 376148
Washtenaw Circuit Court
LC No. 25-000064-NO

Defendant-Appellee.

Before: O'BRIEN, P.J., and FEENEY and WALLACE, JJ.

PER CURIAM.

Plaintiff, Elizabeth O'Brien, as personal representative of the Estate of Bernard Francis O'Brien III,[1] brought suit against the defendant, Trinity Health Ann Arbor Hospital (Trinity), asserting a cause of action for Trinity's violation of the Emergency Medical Treatment and Labor Act (EMTALA), 42 USC 1395dd. Plaintiff appeals as of right from the trial court's order granting Trinity summary disposition pursuant to MCR 2.116(C)(8) (failure to state a claim), MCR 2.116(C)(10) (no genuine issue of material fact), as and additionally pursuant to MCR 2.116(C)(8) and/or (C)(10) because the claim sounds in medical malpractice and plaintiff has failed to comply with the requirements of MCL 600.2912b and MCL 600.2012d.

We reverse the trial court's grant of summary disposition pursuant to MCR 2.116(C)(8), affirm its grant of summary disposition pursuant to MCR 2.116(C)(10), and, in light of that affirmance, decline to consider the issue of whether plaintiff's claim sounded in medical

---

[1] While the caption to plaintiff's complaint indicates that Elizabeth O'Brien brought suit in both an individual and representative capacity, the caption and body of the complaint only refer to one "plaintiff" and the body of the complaint contains no allegations on behalf of Elizabeth O'Brien individually. We will accordingly only refer to the Estate of Bernard Francis O'Brien III as the plaintiff herein.

-1-

malpractice such that summary disposition is appropriate where plaintiff failed to comply with the procedural requirements of such a claim.

## I. FACTS AND PROCEEDINGS

Plaintiff's decedent, Bernard Frances O'Brien III, presented to the emergency department at Trinity Health Emergency Center—Livingston on July 13, 2023 with complaints of chest pain and left leg pain and weakness immediately after having experienced a sudden "pop" sensation in his back. A computed tomography angiography (CTA) revealed a Type A aortic dissection[2] extending from the aortic root through the right iliac artery. Mr. O'Brien was accepted for transport to Trinity Health Ann Arbor Hospital by an emergency department physician at that facility. While he was being transported, radiology advised that

> patient had significant decreased flow in all four main arteries in the neck and brain. We did speak with Dr. Xavier with neuro IR, who said that the patient will likely need to be transferred to the University of Michigan Hospital. As patient was already on his way down to Trinity Health Ann Arbor Hospital, we agree that he will likely need to be transferred once he makes it to that emergency department.

At almost the same time as Mr. O'Brien's arrival at defendant's emergency department in Ann Arbor, defendant's vascular surgeon, who had agreed to take the case, became unable to perform the emergent surgical repair of the aortic dissection due to his need to attend to an existing patient on an emergency basis and suggested transfer to the University of Michigan Hospital.

Preparation for this emergency transfer began immediately, and Mr. O'Brien was transfused with an additional unit of blood due to concerns for hemorrhage. Trinity's emergency department provider note further documents that its emergency department physician

> [h]ad a prolonged discussion with our vascular surgeon in order to determine what the fastest way to get this patient to an operating room was, whether here or at the University of Michigan. The patient was admitted to the University of Michigan promptly, and an emergent MICU[3] ambulance transfer was requested. However, a BLS[4] crew was sent instead. Due to the patient's acuity and the need for ongoing monitoring and possible intervention [en] route, this BLS crew was turned away and MICU crew was sent for the patient.
>
> Immediately prior to arrival by the MICU crew the patient started to complain about increasing pain in his left lower extremity. He was given fentanyl

---

[2] A life-threatening, emergency condition involving a tear in the ascending aorta (near the heart), usually requiring immediate open-heart surgery.
<https://my.clevelandclinic.org/health/diseases/16743-aortic-dissection> (accessed April 1, 2026).

[3] Mobile intensive care unit.

[4] Basic life support.

for analgesia. His vitals remained unchanged throughout his stay which was approximately 90 minutes. He was then transported to the University of Michigan in critical clinical condition.

An emergency transfer record was prepared and attested to by defendant's emergency department physician authorizing the transfer. This pre-printed form contains a separate, bordered "Section A" that, in turn, sets out three numbered boxes, directed the person completing the form to "Check one." The second of these numbered boxes was checked, which states: "I hereby certify that the patient's emergency medical condition has been stabilized such that, within reasonable medical probability, no material deterioration of the patient's condition is likely to result or occur during transfer." A digital depiction of this box from the form is shown below:



As can be seen, the third of these numbered boxes, which states "Patient's emergency medical condition has not been stabilized" is not checked.

Below Section A on the form is a separate, bordered "Section B," entitled "Hospital Obligation," providing in part pertinent to this appeal:

> The hospital must provide you with a medical screening examination to determine if an emergency condition or pregnancy with contractions exist. If they exist, the hospital must provide the additional examination and/or treatment necessary to stabilize the condition unless the benefits of transfer outweighs the risks of transfer. . . . If a transfer is necessary, a transfer certificate will be completed and medically appropriate transfer arranged.

In another separate bordered, section below Section B of the emergency transfer record labelled "Reasons or Benefits of Transfer," defendant's physician checked a box stating: "Services of specialty not available here (specify):" and wrote into the space provided "cardiothoracic surgery."

At the top of the column of text to the right of the foregoing language on the form (and to the immediate right of Section A) is another separate, bordered, unlabelled section containing two additional, unnumbered boxes, and defendant's physician checked (and attested to) the second of those two boxes, which states:

> I hereby certify that based on the reasonable risks and benefit to the patient and based upon the information available at the time of the patient's transfer as outlined, the medical benefits reasonably expected from the provision of the

appropriate medical treatment at another medical facility outweigh the increased risks, if any, to the individual's medical condition (or in the case of labor, to the unborn child) from effecting the transfer.

A digital depiction of this box from the form is shown below:



In a separate, bordered "Section C" defendant's physician checked a box stating "[t]he hospital has, within it's [sic] capacity, provided medical treatment to minimize risk to the individual's health (and in the case of a woman in labor, the health of the unborn child)," and this section is further completed by the physician to state "Dr. Yang has been contacted and Michigan Medicine (hospital) has been contacted and have agreed to accept transfer and provide appropriate treatment, having the available space and qualified personnel for this treatment." Defendant's physician likewise signed and dated Section C of the form, attesting to its statements.

Tragically, Mr. O'Brien died during this MICU transfer to University of Michigan Hospital, and this lawsuit on behalf of his estate followed.

Plaintiff's complaint in this matter asserts a single cause of action for violation of EMTALA and alleges, in part:

25. That Plaintiff's decedent was in fact, not stable and suffered from a critical and emergency medical condition at all times while in Defendant's custody and care of which they had actual knowledge.

26. That in fact, Plaintiff's decedent died of his emergency medical condition since it was not stabilized by the Defendant, during the transfer to another hospital.

27. That Defendant, in violation of EMTALA, failed to stabilize Plaintiff's decedent while under their care and custody and further failed to stabilize him for transfer to another hospital.

28. That as a direct and proximate result of the Defendant's negligent violation of EMTALA, Plaintiff's decedent . . . sustained severe bodily injuries which resulted in conscious pain and suffering and resulted in death[.]

-4-

Trinity eventually brought a motion seeking summary disposition of plaintiff's complaint pursuant to MCR 2.116(C)(8) and (C)(10) based upon defendant having complied with the requirements of EMTALA and because plaintiff failed to comply with the procedural requirements of filing a medical malpractice claim despite the fact that the claim sounds in medical malpractice.

Plaintiff filed a response contending that defendant did not comply with EMTALA; it failed to stabilize Mr. O'Brien's aortic dissection in violation of EMTALA, causing his death. Plaintiff cited to Cleveland Clinic literature indicating that a Type A aortic dissection is an emergency medical condition and that the only means to stabilize or treat it is by way of immediate surgery. It also quoted from the CMS[5] Statement of Deficiencies and Plan of Correction for this incident that "the required stabilization for an aortic dissection is surgical repair." The response further argued that plaintiff was instead entitled to summary disposition based upon "the CMS investigation finding EMTALA violations which were agreed to by the [d]efendant as well as applicable law."

Trinity's reply contended that EMTALA did not forbid transfer, it merely restricts it until the patient is stabilized, if that is possible. It contended that Trinity stabilized Mr. O'Brien as best it could and checked the second of the two unnumbered boxes to the immediate right of Section A, quoted above, certifying that, based on the information available at the time, "the medical benefits reasonably expected from the provision of the appropriate medical treatment at another medical facility outweigh the increased risks, if any, to the individual's medical condition . . . from effecting the transfer," where no surgeon was available at defendant's facility to perform the necessary operation on the aortic dissection. The reply further contended that the CMS Statement of Deficiencies and Plan of Correction plaintiff sought to rely on to demonstrate its entitlement to summary disposition was not dispositive, because it contained no findings regarding the hospital's improper motive or causation, and instead addressed deficiencies in the formatting of the emergency transfer record form, not whether EMTALA required Mr. O'Brien to be stabilized by surgical intervention before any transfer.

After hearing the arguments of counsel at the hearing on Trinity's motion, the trial court held:

I am convinced the defendant did comply with EMTALA, that it was an appropriate transfer. Statute allows transferring hospital provided medical treatment within its capacity, receiving hospital agreed to accept the transfer. Transfer effectuated through qualified personnel in transportation. Under the statute, the hospital may not transfer unless physician certifies based on information available at the time of the transfer the medical benefits of going to the other facility outweigh the increased risk to the individual.

. . . I don't think there's a dispute about the facts. I agree that you think Trinity was trying to get . . . Mr. O'Brien to—the quickest way to get in front of a surgeon. And so they were in a Catch 22. We sit here and watch this guy die or

---

[5] Centers for Medicare & Medicaid Services.

we try to get him over to U of M as fast as we can, because that's going to—that is going to get him under the care of a surgeon faster.

So and I agree, . . . the purpose of this statute was to try to avoid dumping patients, and that was not the case here, they're absolutely just trying to get the patient . . . to a surgeon as quickly as they could.

Also, [I] accept [the] defense argument that you can't avoid the requirements of a med mal claim by renaming it in violation of EMTALA. For all those reasons, all reasons argued by the defendant, I will sign their proposed order.

Defendant's motion for summary disposition is granted. The plaintiff's counter request for summary disposition under [MCR 2.116(I)(2)] is denied. The complaint is dismissed with prejudice.

Plaintiff has failed to state a claim upon which relief can be granted regarding the EMTALA claims, because the hospital fulfilled the EMTALA requirements [the case is] dismissed under [MCR 2.116(C)(8)]. There's no genuine material fact regarding EMTALA claims because the evidence shows the hospital fulfilled the EMTALA requirements dismissed under [MCR 2.116(C)(10)].

The claim [states] medical malpractice [and] should be dismissed under [MCR 2.116(C)(8)] and [(C)(10)] for failure to comply with MCL 600.2912(b) and 600.2012(d.) This is a resolution of the claims and is a final order.

The trial court entered a written order consistent with this ruling on the record that same day and defendant filed this timely appeal of right therefrom.

## II. STANDARD OF REVIEW

"This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

"A motion under MCR 2.116(C)(8) tests the legal sufficiency of a claim." *Krieger v Dep't of Environment, Great Lakes, & Energy*, 348 Mich App 156, 171; 17 NW3d 700 (2023). In other words, such a motion "determines whether the opposing party's pleadings allege a prima facie case." *Stehlik v Johnson*, 206 Mich App 83, 85; 520 NW2d 633 (1994). For such a motion

[w]e accept all factual allegations in the complaint as true, *deciding the motion on the pleadings alone*. We also construe all well-pleaded factual allegations in a light most favorable to the nonmoving party. A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery. [*Krieger*, 348 Mich App at 171 (quotation marks and citations omitted).]

"A motion under MCR 2.116(C)(10) . . . tests the *factual sufficiency* of a claim." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). "In bringing a motion

for summary disposition pursuant to MCR 2.116(C)(10), the moving party bears the initial burden of supporting its position . . . ." *Smith v Globe Life Ins Co*, 460 Mich 446, 455; 597 NW2d 28 (1999).

> The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted." [*Id*. at 455 (citations omitted).]

In reviewing a (C)(10) motion, a court must examine the pleadings, affidavits, depositions, admissions, and any other documentary evidence submitted by the parties and, drawing all reasonable inferences therefrom in favor of the nonmoving party, determine whether a genuine issue of material fact exists. MCR 2.116(G)(5); *Maiden*, 461 Mich at 120; *Downey v Charlevoix Co Bd of Road Comm'rs*, 227 Mich App 621, 626; 576 NW2d 712 (1998). A genuine issue of fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence. *West v Gen'l Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

### III. EMTALA

The federal legislature's intent in enacting EMTALA was to address "incidents where hospital emergency rooms allegedly, based only on a patient's financial inadequacy, failed to provide a medical screening that would have been provided a paying patient, or transferred or discharged a patient without taking steps that would have been taken for a paying patient." *Cleland v Bronson Health Care Group, Inc*, 917 F2d 266, 268 (CA 6, 1990). EMTALA imposes on "participating hospitals"[6] such as Trinity the duty to provide "an appropriate medical screening examination within the capability of the hospital's emergency department" to "any individual [who] comes to the emergency department" and seeks examination or treatment. See *id*., quoting 42 USC 1395dd(a). Further, if the "hospital determines that the individual has an emergency medical condition," EMTALA imposes a duty on the hospital to provide necessary stabilizing treatment, and the hospital may not transfer a patient who is not stabilized (except in certain defined circumstances). See *Cleland*, 917 F2d at 268, quoting 42 USC 1395dd(b)(1), citing 42 USC 1395dd(c)(1).

Whether defendant provided appropriate medical screening is not at issue in the present case. However, that section of the statute contains some language that is pertinent to demonstrating a prima facie EMTALA case. Accordingly, with regard to providing necessary stabilizing

---

[6] "The term 'participating hospital' means a hospital that has entered into a provider agreement under [42 USC 1395dd]." 42 USC 1395dd(e)(2). "Hospitals that execute Medicare provider agreements with the federal government pursuant to 42 USC 1395cc must treat all human beings who enter their emergency departments in accordance with [EMTALA]." *Burditt v United States Dep't of Health and Human Services*, 934 F2d 1362, 1366 (CA 5, 1991).

treatment and not transferring an unstabilized patient except under certain specified circumstances, EMTALA provides, in part pertinent to this appeal:

(a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor

(1) In general

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c).

* * *

(c) Restricting transfers until individual stabilized

(1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless—

(A) . . .

(ii) a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, . . .

 . . . and

(B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

(2) Appropriate transfer

An appropriate transfer to a medical facility is a transfer—

(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

(B) in which the receiving facility--

(i) has available space and qualified personnel for the treatment of the individual, and

(ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment . . . .

* * *

(D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; . . .

* * *

(d) Enforcement

* * *

(2) Civil enforcement

(A) Personal harm

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate. [42 USC 1395dd.]

IV. MCR 2.116(C)(8)

Based upon the foregoing statutory language, to allege a prima facie private cause of action against a hospital for violation of the stabilization or transfer provisions of EMTALA, a plaintiff must assert that: (1) the defendant is a "participating hospital" covered by EMTALA with an emergency department, 42 USC 1395dd(a) and (e); (2) the patient came to the hospital seeking treatment, 42 USC 1395dd(a); (3) the hospital had actual knowledge of the patient's emergency medical condition, 42 USC 1395dd(a)-(b); (4) the hospital committed one or more EMTALA violations,[7] 42 USC 1395dd(a)-(c); and (5) the plaintiff suffered personal harm as the result of the hospital's EMTALA violation, 42 USC 1395dd(d)(2)(A).

Plaintiff's complaint alleges each of these prima facie elements of a cause of action for violation of the stabilization or transfer provisions of EMTALA. In particular, as to whether Trinity committed one or more EMTALA violations, plaintiff's complaint alleges that Trinity "in violation of EMTALA, failed to stabilize [p]laintiff's decedent while under their care and custody and further failed to stabilize him for transfer to another hospital," and "[t]hat as a direct and proximate result of the [d]efendant's negligent violation of EMTALA, [p]laintiff's decedent . . . sustained severe bodily injuries which resulted in conscious pain and suffering and resulted in death[.]"

Trinity does not contest the prima facie elements of an EMTALA claim set forth above. Rather, it asserts that a statutory exception to the general rule that a participating hospital may not transfer an unstabilized patient is applicable. 42 USC §1395dd(c)(1)(A)(ii) and (c)(2)(A).

Accordingly, because plaintiff alleges prima facie elements of a cause of action for violation of the stabilization or transfer provisions of EMTALA, the trial court erred in granting summary disposition of plaintiff's EMTALA claim pursuant to MCR 2.116(C)(8) and we reverse that portion of its order.

### V. MCR 2.116(C)(10)

However, we find the trial court properly granted summary disposition of the complaint pursuant to MCR 2.116(C)(10) because plaintiff failed to present sufficient evidence to create an issue of material fact as to causation: whether defendant's emergency department physician having erroneously indicated on the emergency transfer record that Mr. O'Brien was stabilized (notwithstanding that it otherwise transferred the patient pursuant to a statutory exception to the general rule under EMTALA that a participating hospital may not transfer an unstabilized patient), was a direct and proximate cause of Mr. O'Brien's death.

Trinity argued in its motion for summary disposition and argues on appeal that, under the specific facts of the present case, it was permitted to transfer Mr. O'Brien without having first

---

[7] Some jurisdictions also require proof of an improper motive, but only as to actions based upon violation of § 1395dd(a)'s medical screening requirement. *Roberts v Galen of Virginia, Inc*, 525 US 249, 252-253; 119 S Ct 685; 142 L Ed 2d 648 (1999), citing *Cleland v Bronson Health Care Group, Inc*, 917 F2d 266 (CA 6, 1990). Absent a conflict among the various federal appellate circuits, we are bound by the holding of a federal appellate court concerning interpretation of a federal statute. *Abela v General Motors Corp*, 257 Mich App 513, 523; 669 NW2d 271 (2003).

stabilized him based upon its emergency department physician certifying that "based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual . . . ." and further attesting that "[t]he hospital [has], within its capacity, provided medical treatment to minimize risk to the individual's health . . . ." 42 USC §1395dd(c)(1)(A)(ii) and (c)(2)(A). Pursuant to *Smith*, "[t]he burden then shift[ed] to the opposing party to establish that a genuine issue of disputed fact exists." *Smith*, 460 Mich at 455.

Plaintiff contends in response to Trinity's argument that Trinity's emergency physician, in completing the emergency transfer record, checked the second numbered box and certified that "the patient's emergency medical condition has been stabilized such that, within reasonable medical probability, no material deterioration of the patient's condition is likely to result or occur during transfer," when in fact Mr. O'Brien was not stabilized and "it was a certainty that he would deteriorate and die without surgery." Plaintiff contends that the CMS investigators' conclusion that Trinity thereby violated EMTALA creates an issue of material fact so that its private cause of action should be permitted to proceed.

We disagree that the CMS Statement of Deficiencies and Plan of Correction creates an issue of material fact that the identified EMTALA violation was a direct and proximate cause of Mr. O'Brien's death and neither does plaintiff comes forward with expert testimony or other evidence to establish an issue of material fact as to causation.

At least three unpublished decisions of the Sixth Circuit have uniformly "affirmed grants of summary judgment against plaintiffs who . . . failed to offer any expert testimony establishing that the patient's ultimate injury was caused by an alleged EMTALA violation, as opposed to the medical conditions bringing them to the hospital in the first place." *Galuten v Williamson Co Hosp Dist*, unpublished opinion of the United States Court of Appeals for the Sixth Circuit, issued July 20, 2021 (Case No. 21-5007), p 7, citing *Romine v St Joseph Health Sys*, 541 F Appx 614, 618-619 (CA 6, 2013); *Scott v Mem Health Care Sys, Inc*, 660 F Appx 366, 372-374 (CA 6, 2016).[8] *Galuten* summarized and followed the earlier *Scott* and *Romine* decisions, likewise finding causation in its case "turned on technical medical questions a lay jury is not equipped to answer" as opposed to a case "that *could* turn on common knowledge." *Galuten*, unpub op at 8.

Here, the causation issue is whether the emergency department physician erroneously indicating that Mr. O'Brien's emergency medical condition has been stabilized (but otherwise complying with EMTALA and endeavoring to transfer Mr. O'Brien to University of Michigan Hospital where he could obtain the emergency cardiothoracic surgical repair of his Type A aortic dissection pursuant to the statutory exception to the general rule that a participating hospital may

---

[8] Absent a conflict among the various federal appellate circuits, we are bound by the holding of a federal appellate court concerning interpretation of a federal statute. *Abela v General Motors Corp*, 257 Mich App 513, 523; 669 NW2d 271 (2003). Federal circuit court decisions construing state law are not binding, although this Court may choose to adopt them as persuasive. *Allen v Owens-Corning Fiberglas Corp*, 225 Mich App 397, 402; 571 NW2d 530 (1997).

not transfer an unstabilized patient),[9] caused Mr. O'Brien to die, as opposed to the aortic dissection itself. We think that such a causation opinion on such an issue would require familiarity with the medical conditions, timing, and treatment issues to determine whether the EMTALA violation of incorrectly indicating that the medical condition was stabilized for his transfer "somehow exacerbated his already critical condition" and "turns on questions of medical judgment beyond a jury's common knowledge." *Galuten*, unpub op at 7-8, quoting *Scott*, 660 F Appx at 373, citing *Romine*, 541 F Appx at 618-619. In the present case, in response to Trinity's motion for summary disposition and on appeal plaintiff has offered no evidence of causation, let alone expert testimony of same. Plaintiff has failed to demonstrate a question of material fact as to that prima facie element of a private EMTALA cause of action.

Plaintiff notes that the CMS investigators concluded that defendant violated EMTALA based on its emergency department physician erroneously certifying that Mr. O'Brien was stable, and further, that Trinity's president "signed off on the violations, agreed with them, and further agreed to plans of correction." However, a review of the CMS Statement of Deficiencies and Plan of Action reveals that Trinity's president merely agreed to modify and replace the emergency transfer record form, provide training, and audit EMTALA transfers, in an effort to avoid future erroneous indication that a patient has been stabilized prior to transfer. As the Sixth Circuit held in *Romine*, we find this does nothing to demonstrate an issue of material fact that that erroneous certification was a direct and proximate cause of Mr. O'Brien's ultimate injury for purposes of plaintiff's private cause of action. *Romine*, 541 F Appx at 621. Further, we note that, like the plaintiff in *Romine*, plaintiff "has not identified a single case in which a CMS letter, or even a subsequent final decision from CMS, was held to have any legal significance in an EMTALA case." *Id*. Like *Romine*, we find that Trinity's president's actions documented in the CMS Statement of Deficiencies and Plan of Action are "nothing approaching an adjudication with an opportunity to litigate" that would potentially entitle the CMS decision to preclusive effect. *Id*. and 621-622, citing *Astoria Fed S&L Assoc v Solimino*, 501 US 104, 107; 111 S Ct 2166; 115 L Ed 2d 96 (1991).

We therefore affirm the trial court's grant of summary disposition of plaintiff's EMTALA claim pursuant to MCR 2.116(C)(10). In light of this ruling, we need not address the trial court's alternative basis for summary disposition pursuant to MCR 2.116(C)(8) and/ or (C)(10) based upon plaintiff's claim sounding in medical malpractice and plaintiff having failed to comply with the procedural requirement for bringing such a claim pursuant to MCL 600.2912b and MCL 600.2012d.

As stated herein, we reverse the trial court's grant of summary disposition pursuant to MCR 2.116(C)(8) and affirm its grant of summary disposition pursuant to MCR 2.116(C)(10).

/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney
/s/ Randy J. Wallace

---

[9] 42 USC §1395dd(c)(1)(A)(ii) and (c)(2)(A).